Aram Ordubegian (CA Bar No. 185142)
(*Pro Hac Admission Pending*)
Mette H. Kurth (CA Bar No. 187100)
Andy S. Kong (CA Bar NO. 243933)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:   213.629.7400
Facsimile:   213.629.7401
Email:       ordubegian.aram@arentfox.com
             kurth.mette@arentfox.com
             kong.andy@arentfox.com

General Bankruptcy and Restructuring Attorneys
for Debtors and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA
## RENO DIVISION

| | |
|---|---|
| In re:<br><br>**HI-FIVE ENTERPRISES, LLC**, a California limited liability company; **ONE SOUTH LAKE STREET, LLC**, a Nevada limited liability company; and **WILD GAME NG, LLC**, a Nevada limited liability company d/b/a The Siena Hotel Spa & Casino,<br><br>Debtors and Debtors-In-Possession. | Case No.: 10-bk-54013-GWZ<br><br>[Jointly Administered]<br><br>Chapter 11<br><br>**DEBTORS AND DEBTORS-IN-POSSESSION'S EMERGENCY MOTION FOR AN ORDER:**<br><br>**(1) ESTABLISHING AUCTION PROCEDURES WITH RESPECT TO THE SALE OF THE DEBTORS' REAL AND PERSONAL PROPERTY;**<br><br>**(2) APPROVING AND AUTHORIZING THE SALE BY AUCTION OF THE DEBTORS' REAL AND PERSONAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS, AND**<br><br>**(3) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS, OR, IN THE ALTERNATIVE, APPROVING THE REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS;** |

[ ] Affects all Debtors

[ ] Applies only to Hi-Five Enterprises, LLC

[X] Applies only to One South Lake Street, LLC

[X] Applies only to Wild Game Ng, LLC

LA/353268.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(4) APPROVING THE FORM AND MANNER OF NOTICE; AND**

**(5) APPROVING THE ADDENDUM TO INNOVATION CAPITAL LLC'S ENGAGEMENT LETTER DATED OCTOBER 28, 2010**

**MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF ARAM ORDUBEGIAN AND MATTHEW J. SODL IN SUPPORT THEREOF**

Hearing:
Date:    November 2, 2010
Time:    9:00 a.m.
Place:   300 Booth Street,
         Courtroom 3
         Reno, NV 89509

# TABLE OF CONTENTS

**Page**

I.      JURISDICTION AND VENUE ................................................................................. 5

II.     STATEMENT OF RELEVANT FACTS ................................................................. 5

     A.      Background of the Debtors ................................................................. 5

     B.      Background of the Bankruptcy Cases ............................................. 7

III.    PROPOSED AUCTION PROCEDURES ......................................................... 9

IV.     DISCUSSION ................................................................................................. 11

     A.      The Critical Need for an Expedited Auction Sale ........................ 11

     B.      The Debtors Should Be Granted Authority To Conduct An Auction Sale ........................................................................................ 13

     C.      The Motion Should Be Approved Because Good Business Reasons Exist To Grant the Motion And The Proposed Auction And Sale Of The Property Is In The Best Interests Of The Creditors And The Estates ......................................................................... 14

          1.      Sound Business Purpose Exists ......................................... 14

          2.      Adequate and Reasonable Notice Has Been Given Under the Circumstances ........................................................... 15

          3.      The Proposed Auction Sale is Fair and Reasonable Under the Circumstances ............................................................... 17

          4.      Good Faith ................................................................................. 18

     D.      The Sale Should Be Approved Free And Clear Of All Liens And Encumbrances ........................................................................... 19

          1.      R.E Reno and the Committee Consents to the Sale ........... 19

          2.      Nevada Restaurant Services, Inc.'s Interest is in Bona Fide Dispute ................................................................................. 20

          3.      The Party Asserting the Interest Could be Compelled to Accept a Money Satisfaction ........................................... 21

V.      THE COURT SHOULD PERMIT IMMEDIATE RELIEF ................................. 23

VI.     THE DEBTORS SHOULD BE AUTHORIZED TO ASSUME AND ASSIGN ALL EXECUTORY CONTRACTS AND UNEXPIRED LEASES THE SUCCESSFUL BUYER WISHES TO HAVE ASSIGNED ........................ 24

VII.    CONCLUSION ................................................................................................. 26

LA/353268.1

# **TABLE OF AUTHORITIES**

Page(s)

CASES

*Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC),*
    391 B.R. 25 (B.A.P. 9th Cir. 2008) ................................................................. 23, 24

*GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.,*
    331 B.R. 251 (N.D.Tex. 2005) ...................................................................... 19

*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,*
    318 U.S. 523 (1953) .................................................................................... 27

*In re Abbotts Dairies of Penn., Inc.,*
    788 F.2d 143 (3rd Cir. 1986) ........................................................................ 20

*In re Alpha Indus., Inc.,*
    84 B.R. 703 (Bankr.Mont. 1988) ................................................................... 20

*In re Canyon P'ship,*
    55 B.R. 520 (Bankr.S.D.Cal. 1985) ................................................................ 19

*In re Chung King, Inc.,*
    753 F.2d 547 (7th Cir. 1985) ........................................................................ 19

*In re Continental Air Lines, Inc.,*
    780 F.2d 1223 (5th Cir. 1986) ...................................................................... 16

*In re Delaware & Hudson Railway Co.,*
    124 B.R. 169 (D.Del. 1991) ......................................................................... 17

*In re Eliot,*
    94 B.R. 343 (E.D.Pa. 1988) ......................................................................... 22

*In re FCX, Inc.,*
    60 B.R. 405 (Bankr.E.D.N.Y. 1986) .............................................................. 27

*In re Gaylord Grain LLC,*
    306 B.R. 624 (B.A.P. 8th Cir. 2004) .............................................................. 22

*In re Gulf States Steel, Inc.,*
    285 B.R. 497 (Bankr.N.D.Ala. 2002) ............................................................ 22

*In re Karpe,*
    84 B.R. 926 (Bankr.M.D.Pa. 1988) ............................................................... 17

*In re Medical Software Solutions,*
    286 B.R. 431 (Bankr.D.Utah 2002) ............................................................... 16

*In re New Era Resorts, LLC,*
    238 B.R. 381 (Bankr.E.D.Tenn. 1999) ........................................................... 15

*In re Nicole Energy Services, Inc.,*
    385 B.R. 201 (Bankr.S.D.Ohio 2008) ............................................................ 15

*In re Oglesby,*
    196 B.R. 938 (Bankr.E.D.Va. 1996) .............................................................. 23

*Simantob v. Claims Prosecutor LLC (In re Lahijani),*
   *325 B.R. 289 (B.A.P. 9th Cir. 2005)* ........................................................................... *19*

*In re Walter,*
   *83 B.R. 14 (B.A.P. 9th Cir. 1988)* ..................................................................... 16, 17

*In re Wilde Horse Enter., Inc.,*
   *136 B.R. 830 (Bankr.C.D.Cal. 1991)* .................................................................. 20

*P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dept. of Medical*
   *Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.),*
   *189 B.R. 90 (Bankr.E.D.Va. 1995)* ..................................................................... 23

**STATUTES**

11 U.S.C. § 102 ........................................................................................................... 19

11 U.S.C. § 105(a) ......................................................................................................... 7

11 U.S.C. § 363 ....................................................................................................... 7, 23

11 U.S.C. § 363(b) ........................................................................................... 16, 19, 20

11 U.S.C. §§ 363(b) and (f) .......................................................................................... 15

11 U.S.C. § 363(f) ........................................................................................................ 21

11 U.S.C. § 363(f)(2) .................................................................................................... 22

11 U.S.C. § 363(f)(3) and (5) ....................................................................................... 24

11 U.S.C. § 363(f)(4) .................................................................................................... 22

11 U.S.C. § 363(f)(5) .............................................................................................. 23, 24

11 U.S.C. § 363(k) ........................................................................................................ 13

11 U.S.C. § 365 ............................................................................................................ 26

11 U.S.C. § 365(b) ....................................................................................................... 12

11 U.S.C. § 365(b)(1) ................................................................................................... 26

11 U.S.C. § 365(b)(1)(A) .............................................................................................. 27

11 U.S.C. § 365(b)(1)(C) .............................................................................................. 27

11 U.S.C. § 365(f)(2) .................................................................................................... 26

11 U.S.C. § 506(a) ........................................................................................................ 25

11 U.S.C. § 547 ............................................................................................................ 22

11 U.S.C. § 724(b) ........................................................................................................ 23

11 U.S.C. §§ 1107(a) and 1108 ...................................................................................... 7

11 U.S.C. § 1129 .......................................................................................................... 20

28 U.S.C. § 157 ............................................................................................................... 7

28 U.S.C. § 157(b)(2)(A) ................................................................................................ 7

28 U.S.C. § 157(b)(2)(O) ................................................................................................ 7

28 U.S.C. § 1334 ................................................................................................................ 7

28 U.S.C. § 1408 ................................................................................................................ 7

28 U.S.C. §1409 ................................................................................................................. 7

**RULES**

Fed. R. Bankr. P. 2002 ...................................................................................................... 7

Fed. R. Bankr. P. 2002(a)(2) .......................................................................................... 19

Fed. R. Bankr. P. 6004 ...................................................................................................... 7

Fed. R. Bankr. P. 6004(f) ................................................................................................ 15

Fed. R. Bankr. P. 6004(h) ......................................................................................... 25, 28

Fed. R. Bankr. P. 9006 .................................................................................................... 19

Fed. R. Bankr. P. 9007 .................................................................................................... 19

Fed. R. Bankr. P. 9014 .................................................................................................... 19

Fed. R. Bankr. P. 9014 ...................................................................................................... 7

1    **TO: THE HONORABLE GREGG W. ZIVE, UNITED STATES**

2    **BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE,**

3    **AND ALL PARTIES ENTITLED TO NOTICE:**

4    One South Lake Street, LLC ("One South") and Wild Game Ng, LLC ("Wild

5    Game"), doing business as The Siena Hotel Spa & Casino (collectively, the "Debtors"),

6    by and through their attorneys, hereby move this Court, on an emergency basis for entry

7    of an order (a) establishing auction procedures with respect to the sale of the Debtors' real

8    and personal property; (b) approving and authorizing the sale by auction of the Debtors'

9    real and personal property free and clear of liens, claims, interests, and encumbrances,

10   subject to higher and better offers, (c) approving the assumption and assignment of certain

11   unexpired leases and executory contracts to the winning bidder (the "Assumed

12   Agreements") and establishing the cure amounts, if any, payable under such Assumed

13   Agreements, or, in the alternative, approving the rejection of the Debtors' unexpired

14   leases and executory contracts to the extent such agreements are not assumed and

15   assigned to the winning bidder (the "Rejected Agreements"), (d) approving that certain

16   addendum to Innovation Capital, LLC's ("Innovation") engagement letter dated October

17   28, 2010; and (e) granting such other and further relief the Court deems just and proper.

18   The Debtors will require any Qualified Bidder (as that term is defined in the

19   Motion) to execute a *Real Property Purchase and Sale Agreement* (the "Purchase

20   Agreement") substantially in the form attached hereto as Exhibit "A". Attached as

21   Exhibit "B" to the Declaration of Aram Ordubegian (the "Ordubegian Declaration") is a

22   list of all of the contracts that may become Assumed Agreements or Rejected Agreements

23   (collectively, the "Unexpired Contracts and Leases") and the amount of money that the

24   Debtors believe needs to be paid by the Successful Buyer to the counter parties to the

25   Unexpired Contracts and Leases to satisfy the cure requirements of 11 U.S.C. § 365(b).

26   One South leases The Siena Hotel Spa & Casino (the "Siena") and the adjacent

27   parking lot property and expansion property in Reno, Nevada (collectively, the

28   "Property") to Wild Game. Wild Game was operating the Property until recently.

1   Operations ceased once Wild Game was unable to fund continued operational expenses.

2   Siena is a boutique hotel featuring 185 rooms and 29 suites that range in size up to 1,200

3   square feet. The hotel also has a convention, meeting and banquet space as well as

4   various bars and restaurants and a spa located on the premises. The casino is 23,000

5   square feet and owns approximately 243 slot machines, 28 gaming tables, and a poker

6   room, as well as a race and sports book. Siena is one of the only boutique hotel spa

7   casinos in Reno and therefore, it is not in direct competition with any of the other

8   properties in Reno. However, as is detailed in the annexed Memorandum of Points and

9   Authorities, the Debtors have suffered serious ongoing liquidity issues that ultimately

10  resulted in the closing of Siena's gaming floor and more recently, the shutdown of their

11  business operations on October 21, 2010.

12        After the filing of these bankruptcy cases, Wild Game entered into an engagement

13  letter on September 20, 2010 with Innovation and filed an application to employ

14  Innovation as their investment banker to assist them in locating a transaction partner to

15  provide new money financing or -- subject to the execution by the Debtors' of a written

16  addendum to Innovation's engagement letter -- to assist them in locating an investor to

17  purchase the Debtors' assets and more specifically, the Property and Wild Game's

18  personal property. The Debtors and Innovation have been actively engaged in seeking a

19  new money financing partner since that time, and more recently, they have been actively

20  engaged in seeking a purchaser and structuring a sale process since roughly October 1,

21  2010. Most, if not all, potential financing partners stated that a purchase of assets was a

22  better route for them.

23        On or about October 28, 2010, the Debtors' executed an addendum to Innovation's

24  engagement letter formally expanding Innovation's engagement to include assistance in

25  locating an investor to purchase the Debtors' assets and to retroactively approve and ratify

26  Innovation's prior efforts in that respect. Innovation, working closely with the Debtors,

27  has conducted an exhaustive sale process, has prepared detailed sale materials, and has

28  had extensive discussions and interactions with numerous prospective buyers. While

1    Innovation has engaged in substantial due diligence and negotiations with a number of

2    different prospective buyers, none of the prospective buyers have made a binding,

3    acceptable offer at this time.  The hoped for "stalking-horse" bidder did not materialize

4    over the October 30 and 31 weekend and the auction procedures outline herein have now

5    become the Debtors' best option.  Innovation has been informed from numerous

6    prospective purchasers however, that they intend to participate at an auction and that they

7    can be prepared to make a binding purchase offer as early as November 9, 2010.

8         The Debtors believe that it is critical to consummate a sale of the Property on an

9    expedited basis due to the shutdown of the Siena and the continuing deterioration of

10   Siena's goodwill if a sale is not consummated on an emergency basis.  In addition, given

11   the shutdown of the Siena, the Property is now incurring monthly maintenance costs

12   without generating operating income to cover those costs, and the Property is exposed to

13   the risk of vandalism and other deterioration associated with maintaining the Property in a

14   non-operational, boarded up condition.  The Debtors therefore believe that an expedited

15   sale of the Property is necessary to minimize immediate and irreparable harm to the

16   Debtors' Property, creditors and the bankruptcy estates.  Having not yet received a

17   binding, acceptable offer, under the circumstances, the Debtors and Innovation believe

18   that a public auction sale will bring the maximum value for the Property and will be in the

19   best interest of the Debtors' estates and creditors.  The Debtors propose that the auction

20   (the "Auction") be conducted on November 9, 2010 at 9:00 a.m. at the Siena located at 1

21   South Lake Street, Reno, NV 89501, with a hearing before the Court to approve the

22   auction sale of the Property and personal property assets to the winning bidder on

23   November 10, 2010.  At the Auction, Qualified Bidders will have an opportunity to bid

24   and overbid, if necessary, on the Property and the personal property assets in accordance

25   to the procedures proposed herein.  There will be no opening minimum bid and

26   overbidding will be in increments of $100,000.

27        The Debtors have been in extensive discussions with the Official Committee of

28   Unsecured Creditors for the Debtors (the "Committee") and with R.E. Reno, LLC ("RE

Reno"), One South's secured creditor. The Debtors submit that the Committee and RE Reno will both consent to the auction sale of the Property and Wild Game's personal property assets.

The relief sought in this Motion is based upon this Motion, the annexed Memorandum of Points and Authorities and the Declarations of Aram Ordubegian and Matthew J. Sodl, the statements, arguments and representations of counsel to be made at the hearing on the Motion, the record in these cases, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

**WHEREFORE**, the Debtors respectfully request that this Court enter an order: (a) establishing auction procedures with respect to the sale of the Debtors' real and personal property; (b) approving and authorizing the sale by auction of the Debtors' real and personal property free and clear of liens, claims, interests, and encumbrances, subject to higher and better offers, (c) approving the assumption and assignment of certain unexpired leases and executory contracts to the winning bidder and establishing the cure amounts, if any, payable under such Assumed Agreements, or, in the alternative, approving the rejection of the Debtors' unexpired leases and executory contracts to the extent such agreements are not assumed and assigned to the winning bidder, (d) approving that certain addendum to Innovation's engagement letter dated October 28, 2010; and (e) granting such other and further relief the Court deems just and proper.

Dated: November 1, 2010                    **ARENT FOX LLP**


                                           By: */s/ Aram Ordubegian*
                                              ARAM ORDUBEGIAN
                                              METTE H. KURTH
                                              ANDY S. KONG
                                              Attorneys for Debtors and Debtors-in-
                                              Possession

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### JURISDICTION AND VENUE

4      1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a

5    core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  The venue of this case is

6    proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7      2.      The statutory predicates for the relief sought herein are sections 105(a) and

8    363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004,

9    and 9014 of the Federal Rules of Bankruptcy Procedure (the "FRBP").

10

### II.

11

### STATEMENT OF RELEVANT FACTS

12  **A.      Background of the Debtors.**

13      3.      On July 21, 2010 (the "Petition Date"), the Debtors filed voluntary petitions

14   for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage

15   their affairs as debtors and debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and

16   1108.  No trustee or examiner has been appointed in the above-captioned cases.  The

17   Committee was appointed in the above-captioned cases (the "Cases") on August 11, 2010.

18      4.      One South was formed for the purpose of owning and leasing improved real

19   property in Reno, Nevada commonly known as The Siena Hotel Spa & Casino ("Siena")

20   and the adjacent parking lot and expansion property (collectively with the Siena, the

21   "Property").

22      5.      On or about March 6, 2000, One South (as successor-in-interest to Hi-Five

23   and Five-Way Development) entered into a *Land Lease* and *Hotel Casino Lease* (the

24   "Lease") pursuant to which it leases the Property to Wild Game.  These lease agreements

25   were subsequently modified by the *Modification of Hotel Casino Lease* dated April 14,

26   2000.  Wild Game operated the hotel, casino, and spa owned by One South.

27      6.      Siena is a boutique hotel featuring 185 rooms and 29 suites that range in size

28   up to 1,200 square feet.  The hotel also has a convention, meeting and banquet space as

-7-

LA/353268.1

1  well as various bars and restaurants and a spa located on the premises.  The casino is

2  23,000 square feet and boasts all the latest equipment of a modern-day gaming complex.

3  The casino owns approximately 243 slot machines, 28 gaming tables, and a poker room,

4  as well as a race and sports book.  Siena is one of the only boutique hotel spa casinos in

5  Reno and therefore, is not in direct competition with any of the other properties in Reno.

6        7.    Siena's spa is an important feature that attracts both local customers and

7  guests of the resort and adjacent resorts.  The spa boasts eleven therapy rooms offering a

8  number of treatments and a mediation center.  The spa is integrated into the adjacent pool

9  and outdoor recreation area which also provides food and beverage services to its guests.

10        8.    Additional general background as well as a detailed summary of the events

11  leading to the filing of these Chapter 11 cases can be found in the *Omnibus Declaration of*

12  *Barney Ng* filed in support of the Debtors' first day motions and that declaration is

13  incorporated herein by reference.

14        9.    The Debtors' commenced these cases in large part in order to obtain the

15  breathing space afforded by the Bankruptcy Code's automatic stay while they attempted

16  to stabilize their operations, searched for new financing to support Wild Game's

17  operations, and evaluated the possible need for a sale of the Property or restructuring of

18  the Debtors' debt structure.  Commencing on or about October 1, 2010, the Debtors,

19  through Innovation, began to proceed on two tracks, actively seeking not only new

20  financing but also actively seeking an investor interested in acquiring the Property and

21  structuring a sale process designed to maximize the Property value in any such auction.

22  The Debtors have identified at least three to four serious investors with the desire and

23  financial means to acquire the Property.  They have been approached by additional

24  interested buyers over this past weekend, and they are still in limited discussions with at

25  least one party interested in financing a re-start of Wild Game's operations.  Accordingly,

26  as discussed below, the Debtors are hereby seeking approval of auction procedures to sell

27  the Property and Wild Game's personal property assets.

28

LA/353268.1

1    **B.    Background of the Bankruptcy Cases.**

2        10.    After the filing of these bankruptcy cases, Wild Game entered into an

3    engagement letter on September 20, 2010 with Innovation and filed an application to

4    employ Innovation as their investment banker to assist them in locating a transaction

5    partner to provide new money financing or -- subject to the execution by the Debtors' of a

6    written addendum to Innovation's engagement letter -- to assist them in locating an

7    investor to purchase the Debtors' assets and more specifically, the Property and Wild

8    Game's personal property.[1]  The Debtors and Innovation have been actively engaged in

9    seeking a new money financing partner since that time, and more recently, they have been

10   actively engaged in seeking a purchaser and structuring a sale process since roughly

11   October 1, 2010.  Most new financing partners also expressed an interest in buying the

12   Property and the personal property assets outright at an auction.

13       11.    On or about October 28, 2010, the Debtors' executed an addendum to

14   Innovation's engagement letter formally expanding Innovation's engagement to include

15   assistance in locating an investor to purchase the Debtors' assets and to retroactively

16   approve and ratify Innovation's prior efforts in that respect.  Attached hereto as Exhibit

17   "D" is a copy of the addendum.

18       12.    On October 8, 2010, the Debtors were faced with a serious liquidity crisis

19   precipitated by their inability to pay certain required post-petition obligations.  The

20   Debtors considered a full shutdown of the Siena at that time.  However, several investors

21   remained interested in financing the property's operations or purchasing the Property,

22   even on a very compressed timeframe.  Accordingly, in order to allow the negotiations to

23   further develop, the Debtors took the interim step of closing the gaming floor at the Siena,

24   thereby eliminating their minimum bankroll requirement and freeing up cash to pay

25   various operating expenses, including outstanding utility bills, Nevada gaming taxes, and

26   certain insurance premiums.

27

28   ───────────────
     [1] An order approving Innovation's employment application has not been entered yet.

LA/353268.1

13.     This then drastic step provided the Debtors and Innovation with additional time to continue dialog with various interested investors.  While the Debtors and Innovation have made significant progress in developing sale and auction procedures and there is considerable investor interest among parties with the financial means to purchase the Property, the loss of revenue precipitated by the closing of the gaming floor left Wild Game without sufficient revenue to continue to operate the hotel business.  Accordingly, on October 21, 2010, as this Court is aware, the Debtors concluded that they are unable to continue to fund operations while these negotiations played out, and shutdown their hotel operation.

14.     Since the shutdown of the hotel operation, Innovation and the Debtors have continued to engage in substantial due diligence and negotiations with a number of different prospective buyers.  However, none of the prospective buyers have made a binding, acceptable offer at this time, nor has any party been approved by the Debtors to serve as a "stalking-horse" buyer.  Innovation has been informed from numerous prospective purchasers however, that they intend to participate at an auction and that they can be prepared to make a binding purchase offer as early as November 9, 2010.  The Debtors have identified at least three to four serious investors with the desire and financial means to acquire the Property and personal property assets.  They have been approached by additional interested buyers over the weekend, and they are still in discussions with at least one party interested in financing a re-start of Wild Game's operations.

15.     Therefore, the Debtors have determined that the appropriate strategy to maximize value to their creditors is to conduct a sale by public auction of the Property as provided herein.  Naturally, the Debtors are open to a longer marketing and auction period if such is stipulated to by the parties or ordered by the Court.  The short time period is necessitated by the fact that the Debtors believe that on or about November 1, 2010, certain utility companies and their insurance carrier will issue ten (10) day termination notices to the Debtors for post-petition expenses that the Debtors have no cash resources to satisfy absent a sale of the Property and personal property assets.  If utilities are

- 10 -

terminated, the Property is at risk of being "red-tagged" by the fire department because without utilities, essential fire-safety equipment cannot be maintained, further reducing the value of the Property.  Moreover, Innovation has indicated that given the fact that it has already canvassed the most likely purchasers for the Property; many of those potential purchasers have conducted considerable due diligence; the Property sale, which is little more than a real estate transaction at this juncture, is not particularly complex; and many of the potential purchasers have indicated that they will be prepared to bid at an auction by November 9, 2010 -- the proposed auction strategy and date is the appropriate value-maximizing strategy for the Property under the circumstances.

16.    The Debtors have been in extensive discussions with the Committee and RE Reno.  The Debtors submit that, under the circumstances, the Committee and RE Reno will both consent to the auction sale of the Property and Wild Game's personal property assets.

### III.

### PROPOSED AUCTION PROCEDURES

17.    The Debtors propose to sell by auction, the Property and the personal property located at the Property "as is, where is", free and clear of all liens, claims, encumbrances and interests with any such interests to attach to the sale proceeds with the same validity and priority as existed prior to the sale.  Attached hereto as Exhibit "C" is a list of all purported lienholders with an interest in the Property to be sold.

18.    The Debtors will require any Qualified Bidder (defined below) to execute a *Real Property Purchase and Sale Agreement* substantially in the form attached hereto as Exhibit "A".

19.    The Debtors respectfully request the Court to approve the assumption and assignment of certain unexpired leases and executory contracts to the winning bidder (the "Assumed Agreements") and establishing the cure amounts, if any, payable under such Assumed Agreements, or, in the alternative, approving the rejection of the Debtors' unexpired leases (including the Lease) and executory contracts to the extent such

- 11 -

LA/353268.1

1  agreements are not assumed and assigned to the winning bidder (the "Rejected

2  Agreements"). Attached hereto as Exhibit "B" is a list of all of the contracts that may

3  become Assumed Agreements or Rejected Agreements (collectively, the "Unexpired

4  Contracts and Leases") and the amount of money that the Debtors believe needs to be paid

5  by the Successful Buyer to the counter parties to the Unexpired Contracts and Leases to

6  satisfy the cure requirements of 11 U.S.C. § 365(b).

7        20.    The Debtors further propose to conduct the Auction on November 9, 2010 at

8  9:00 a.m. at the Siena located at 1 South Lake Street, Reno, NV 89501, with a hearing

9  before the Court to approve the auction sale of the Property and personal property assets

10  to the winning bidder on November 10, 2010. At the Auction, Qualified Bidders will

11  have an opportunity to bid and overbid, if necessary, on the Property and the personal

12  property assets in accordance to the procedures proposed herein. There will be no

13  opening minimum bid and overbidding will be in increments of $100,000.

14        21.    The Debtors propose to conduct the Auction in all respects in the manner

15  that the Debtors and their professionals, in consultation with the Committee and RE Reno,

16  determine will result in the highest, best or otherwise financially superior offer(s) for the

17  Property and personal property assets, provided that such manner is not inconsistent with

18  the provisions hereof, the Motion, the Bankruptcy Code, or any orders of the Bankruptcy

19  Court.

20        22.    All prospective buyers are required to make a deposit of Two Hundred Fifty

21  Thousand and 00/100 Dollars ($250,000.00) by way of wire transfer to a segregated U.S

22  Bank account or other such account as required by the Debtors by Monday, November 8,

23  2010 at 12:00 p.m. Pacific Standard Time (the "Deposit"). The Deposit is a

24  nonrefundable deposit and will be forfeited in the event that the successful buyer (the

25  "Successful Buyer") at the Auction fails to close this transaction within forty-eight (48)

26  hours following entry of an order approving the winning buyer as the Successful Buyer.

27        23.    In order for a prospective buyer to become a Qualified Bidder and to

28  participate at the Auction, the following will be necessary by November 8, 2010 at 12:00

LA/353268.1

p.m. Pacific Standard Time: (1) Timely wire of the Deposit; (2) written evidence of a commitment for financing or other evidence of ability to support initial bid and any subsequent over-bid to timely consummate the proposed transaction satisfactory to Debtors, the Committee, and RE Reno; and (3) a mark-up of the proposed changes to the Purchase Agreement, including the proposed allocation of the purchase price between the real property asset and the personal property assets.

24.    Deposits of all overbidders shall be held by the Debtors until the second (2nd) business day after an order approving the sale is entered, after which time the deposits of the non-successful bidders, other than those of any Back-Up Bidder(s) (defined below) designated by the Debtors, shall be returned.  If the Successful Buyer fails to consummate a Bankruptcy Court approved sale because of a material breach or failure to perform on the part of such Successful Buyer, the Debtors shall be entitled to retain the Deposit.

25.    The Debtors shall designate a second party or parties as the back-up bidder(s) (the "Back-Up Bidder(s)") whose bid(s) shall remain binding and in effect, until such time as the sale to the Successful Buyer is closed.  In the event that the Successful Buyer is unable to consummate the purchase of the Property, the Debtors shall sell such Property and the personal property assets to the Back-Up Bidder(s).

26.    All bidding shall be made in U.S. dollars and the forms of payment must be made in U.S. currency.

27.    RE Reno's rights to credit-bid under 11 U.S.C. § 363(k) will not be affected by these auction procedures.

## IV.

## DISCUSSION

**A.    The Critical Need for an Expedited Auction Sale.**

As the Court is aware, the Debtors have suffered serious, ongoing liquidity issues which resulted in the closing of Siena's gaming floor recently and ultimately, the shutdown of their business operations on October 21, 2010.

- 13 -

LA/353268.1

1    The Debtors and Innovation have been actively engaged in seeking a new money

2    financing partner, and more recently, they have been actively engaged in seeking a

3    purchaser and structuring a sale process since roughly October 1, 2010. On or about

4    October 28, 2010, the Debtors' executed an addendum to Innovation's engagement letter

5    formally expanding Innovation's engagement to include assistance in locating an investor

6    to purchase the Debtors' assets and to retroactively approve and ratify Innovation's prior

7    efforts in that respect. Innovation, working closely with the Debtors' insiders, has

8    conducted an exhaustive sale process, has prepared detailed sale materials, and has had

9    extensive discussions and interactions with numerous prospective buyers. While

10   Innovation has engaged in substantial due diligence and negotiations with a number of

11   different prospective buyers, none of the prospective buyers have made a binding,

12   acceptable offer at this time. Innovation has been informed from numerous prospective

13   purchasers however, that they intend to participate at an auction and that they can be

14   prepared to make a binding purchase offer as early as November 9, 2010. Indeed,

15   Innovation expects a robust Auction.

16   The Debtors believe that it is critical to consummate a sale of the Property on an

17   expedited basis due to the shutdown of the Siena and the continuing deterioration of

18   Siena's goodwill if a sale is not consummated on an emergency basis. In addition, given

19   the shutdown of the Siena, the Property is now incurring monthly maintenance costs

20   without generating operating income to cover those costs, and the Property is exposed to

21   the risk of vandalism and other deterioration associated with maintaining the Property in a

22   non-operational, boarded up condition. The Debtors therefore believe that an expedited

23   sale of the Property is necessary to minimize immediate and irreparable harm to the

24   Debtors' Property, creditors and the bankruptcy estates. Having not yet received a

25   binding, acceptable offer, under the circumstances, the Debtors and Innovation believe

26   that a public auction sale will bring the maximum value for the Property and will be in the

27   best interest of the Debtors' estates and creditors. At the Auction, Qualified Bidders will

28   have an opportunity to overbid on the Property. The Debtors are however, open to a

- 14 -

1  longer marketing and auction period if such is stipulated to by the parties or ordered by

2  the Court.

3  **B.      The Debtors Should Be Granted Authority To Conduct An Auction Sale.**

4          By this Motion, the Debtors seek an order pursuant to 11 U.S.C. §§ 363(b) and (f),

5  authorizing the public auction sale of the Property and the personal property assets of

6  Wild Game, free and clear of all liens, claims, encumbrances and other interests, with any

7  such interests to attach to the sale proceeds with the same validity and priority as existed

8  prior to the sale or be paid in full.

9          Auction sales, such as that requested here, are specifically authorized under the

10  Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. Rule 6004(f) of the

11  Federal Rules of Bankruptcy Procedure provides that "All sales not in the ordinary course

12  of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f). It is

13  within the sound discretion of the court to determine whether to approve or disapprove of

14  a method for the disposition of estate property. *In re Nicole Energy Services, Inc.*, 385

15  B.R. 201, 230 (Bankr.S.D.Ohio 2008) (citations omitted); *In re New Era Resorts, LLC*,

16  238 B.R. 381, 387 (Bankr.E.D.Tenn. 1999).

17          The Debtors believe that, under the circumstances, a public auction sale will bring

18  the maximum value for the Property and the personal property assets. The Debtors'

19  investment banker Innovation will continue to actively market the Property and speak to

20  potential parties interested in purchasing the Property. Notice of this Auction will be

21  distributed in a manner to encourage participation in the Auction by as many interested

22  qualified buyers as possible and notice of the Auction will be provided in accordance with

23  the FRBP and Local Bankruptcy Rules. The Debtors submit that the Auction of the

24  Property and the personal property assets is reasonable under the circumstances especially

25  given the shutdown of the Debtors' business operations.

26

27

28

LA/353268.1

- 15 -

C.      **The Motion Should Be Approved Because Good Business Reasons Exist To Grant the Motion And The Proposed Auction And Sale Of The Property Is In The Best Interests Of The Creditors And The Estates.**

To approve a sale of substantially all of a debtor's assets outside the ordinary course of business pursuant to 11 U.S.C. § 363(b), courts consider the following factors:

a.      whether a sound business reason exists for the sale;

b.      whether adequate and reasonable notice has been given to interested parties;

c.      whether the sale price is fair and reasonable; and

d.      whether the proposed buyer is proceeding in good faith.

*In re Walter*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988); *In re Medical Software Solutions*, 286 B.R. 431, 439-40 (Bankr.D.Utah 2002).  The Debtors submit that the proposed auction sale of the Property free and clear of liens, claims and interests, satisfies each of the aforementioned requirements.

1.      **Sound Business Purpose Exists.**

Courts consider the following nonexhaustive list of factors in determining whether a good business reason exists to approve a proposed sale:

a.      the proportionate value of the asset to the estate as a whole;

b.      the amount of elapsed time since the petition date;

c.      the likelihood of a confirmable plan of reorganization;

d.      the effect of the sale on the future plans of reorganization;

e.      the proceeds to be obtained from the sale vis-à-vis any appraisals of the property;

f.      which of the alternatives of use, sale or lease the proposal envisions; and

g.      whether the asset is increasing or decreasing in value.

*In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) cited with approval by

LA/353268.1

*Walter, supra* at 19.  The Ninth Circuit has adopted a flexible case-by-case test in determining whether a business justification exists.  *See Walter, supra* at 19.

Here, as evidenced by the closing of the gaming floor and the recent shutdown of the Debtors' business operations, the Debtors do not have the ability to survive in these chapter 11 cases for much longer.  If the Debtors are unable to sell the Property by auction in these chapter 11 cases on an expedited timeframe, these cases will be converted to cases under chapter 7, incurring an additional layer of administrative expenses and wasting invaluable time while the Debtors' customer base and goodwill continue to deteriorate, to the detriment of the Debtors' estates and the creditor body.  In addition, given the shutdown of the Siena, the Property is now incurring monthly maintenance costs without generating operating income to cover those costs, and the Property is exposed to the risk of vandalism and other deterioration associated with maintaining the Property in a non-operational, boarded up condition.  The Debtors therefore believe that an expedited sale of the Property and the personal property assets is necessary to minimize immediate and irreparable harm to the Debtors' Property, creditors and the bankruptcy estates.  Moreover, the proposed Auction will allow the Debtors to liquidate their main assets in an orderly manner within the confines of a chapter 11 case and maximize the Property's value for the benefit of creditors of these estates.  Therefore, this Court should find good business reasons exist to justify the proposed expedited auction sale.

  **2.**  **Adequate and Reasonable Notice Has Been Given Under the Circumstances.**

The purpose of the notice requirement is to provide an opportunity for objections and a hearing before the court if there are objections.  *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 180 (D.Del. 1991); *In re Karpe*, 84 B.R. 926, 930 (Bankr.M.D.Pa. 1988).  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections.  *Id.*

The Debtors have conducted a UCC-1 search and the results thereof show five entities having filed UCC-1 financing statements with respect to various gaming

- 17 -

LA/353268.1

equipment and lighting fixtures owned by Wild Game and located at the Siena: IGT,
Konami Gaming, Inc., Raymond Leasing Corp., Young Electric Sign Company, and PDS
Gaming Corporation.  The Debtors have not yet determined whether the underlying
agreements with these parties are properly characterized as leases or financing
agreements.  These leases have an aggregated unpaid balance of approximately
$2,101.406.90.  These five purported secured equipment lenders (the "Equipment
Lenders") and the unpaid balances owed to these Equipment Lenders are summarized as
follows:

| UCC-1 FILING | UNPAID BALANCE |
|---|---|
| 1.  Liens asserted by IGT with regard to property covered by UCC financing statement file number 20060387886 recorded with Nevada Secretary of State on November 21, 2006. | $1,007,591.10 |
| 2.  Liens asserted by Konami Gaming, Inc. with regard to property covered by UCC financing statement file number 20090204999 recorded with Nevada Secretary of State on August 20, 2009. | $933,308.50 |
| 3.  Liens asserted by Raymond Leasing Corp. with regard to property covered by UCC financing statement file number 20080236398 recorded with Nevada Secretary of State on July 29, 2008. | $1,616.34 |
| 4.  Liens asserted by Young Electric Sign Company with regard to property covered by UCC financing statement file number 20070115605 recorded with Nevada Secretary of State on April 11, 2007. | $136,862.81 |
| 5.  Liens asserted by PDS Gaming Corporation with regard to property covered by UCC financing statement file number 20080285036 recorded with Nevada Secretary of State on September 15, 2008. | $22,028.24 |
| **TOTAL** | **$2,101.406.90** |

LA/353268.1

1    The Debtors will provide notice of the Motion and Auction to the foregoing

2    Equipment Lenders and Nevada Restaurant Services, Inc. (discussed below).  To that end,

3    the Debtors have complied with all of the applicable provisions of the Bankruptcy Code,

4    the Bankruptcy Rules and the Local Bankruptcy Rules.  Specifically, the Debtors have

5    given notice of this Motion and the proposed Auction, in accordance with Bankruptcy

6    Rules 2002(a)(2), 9007, and Rules 9006 and 9014 of the Local Bankruptcy Rules, to all

7    known creditors and parties-in-interest in these bankruptcy cases, all government agencies

8    entitled to notice, all secured parties, including the Equipment Lenders, and all parties to

9    the Unexpired Contracts and Leases attached hereto as Exhibit "B", by first class mail.

10    Moreover, the Debtors and Innovation have conducted an exhaustive sale process, have

11    prepared detailed sale materials and have had extensive discussions and interactions with

12    numerous prospective buyers.  They will continue to actively seek potential buyers and

13    bidders and will also publicize the Auction in a commercially reasonable manner based

14    upon the circumstances here.  All known interested buyers will be sent a copy of the order

15    approving the auction procedures and notice of the Auction by email and overnight mail

16    and will be contacted by telephone and email by Innovation within twenty-four (24) hours

17    of entry of the Court's order.  The Debtors believe that such notice constitutes adequate

18    notice and opportunity for a hearing pursuant to 11 U.S.C. § 102 and requests that such

19    notice be approved by this Court as being adequate under all of the circumstances.

20    **3.**      **The Proposed Auction Sale is Fair and Reasonable Under the**

21           **Circumstances.**

22    In order for a sale to be approved under 11 U.S.C. § 363(b), the purchase price

23    must be fair and reasonable.  *See generally*, *In re Canyon P'ship*, 55 B.R. 520

24    (Bankr.S.D.Cal. 1985).  The trustee (or debtor-in-possession) is afforded great judicial

25    deference in this regard.  *Id.; see also*, *Simantob v. Claims Prosecutor LLC (In re*

26    *Lahijani)*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); *GBL Holding Co., Inc. v.*

27    *Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D.Tex. 2005).  In any sale of estate

28    assets, the ultimate purpose is to obtain the highest price for the property sold.  *In re*

- 19 -

1  *Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985); *In re Alpha Indus., Inc.*, 84 B.R. 703, 705

2  (Bankr.Mont. 1988).

3      Since the Property and the personal property assets will be sold after extensive

4  marketing and in auction format, the Debtors submits that the final purchase price offered

5  for its assets at the conclusion of the Auction will establish the fair market value for the

6  Property and the personal property assets.

7      **4.    Good Faith.**

8      When a bankruptcy court authorizes a sale of assets under 11 U.S.C. § 363(b), it is

9  required to make a finding with respect to the "good faith" of the purchaser. *In re Abbotts*

10  *Dairies of Penn., Inc.*, 788 F.2d 143, 149 (3rd Cir. 1986).  Such a procedure ensures that

11  11 U.S.C. § 363(b) will not be employed to circumvent the creditor protections of Chapter

12  11 and as such, it mirrors the requirement of 11 U.S.C. § 1129 in that the bankruptcy court

13  independently scrutinizes the debtor's reorganization plan and makes a finding that it has

14  been proposed in good faith. *Id.* at 150.  With respect to the Debtors' conduct here in

15  conjunction with the auction sale of the Property and personal property assets, the good

16  faith requirement focuses principally on whether there is any evidence of "fraud, collusion

17  between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

18  advantage of other bidders." *Id.* at 147, *In re Wilde Horse Enter., Inc.*, 136 B.R. 830, 842

19  (Bankr.C.D.Cal. 1991).

20      Here, since the assets will be subject to a public auction, the highest and best price

21  possible for the Property and the personal property assets will be determined following an

22  open and transparent bidding process.  There is no fraud or collusion in connection with

23  the proposed auction and sale since each prospective buyer will have the opportunity to

24  make an offer on the assets, which offer will be subject to competitive overbidding by

25  other prospective buyers.  The Debtors will also ask all Qualified Bidders to disclose on

26  the record any and all connections or interests they hold with or in the Debtors, the

27  Debtors' agents, members, directors, officers and employees, and the Debtors' bankruptcy

28

LA/353268.1

estates.  Based on the foregoing, and since the Auction will ultimately be reviewed by the Court, the Debtors offer that the prospective buyers are "good faith" purchasers.

**D.**    **The Sale Should Be Approved Free And Clear Of All Liens And Encumbrances.**

The Debtors ask that the Court approve the sale of the Property to the Successful Buyer free and clear of all interests, with any such interests to attach to the sale proceeds with the same validity and priority as existed prior to the sale or be paid in full.

Section 363(f) of the Bankruptcy Code provides that a debtor may sell property free and clear of any interest in such property if one of the following conditions is satisfied:

(1)    applicable non bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f).  Because section 363(f) is stated in the disjunctive, when selling property of the estate, it is only necessary to meet one of the five conditions above.  Here, the Debtors believe one or more of the five subsections above are satisfied as discussed below.

**1.**    **R.E Reno and the Committee Consents to the Sale.**

As discussed above, RE Reno is the Debtors' largest purported secured creditor holding a security interest in substantially all of the assets of One South.  RE Reno has indicated its consent to the proposed auction sale herein.  Under the circumstances, the Debtors also expect the Committee's consent to the proposed sale of the Property and related personal property assets.

- 21 -

1    With respect to all other parties who do not file a timely objection to the proposed

2    auction sale here, the Debtors respectfully request the Court to deem all such parties to

3    have consented to the proposed sale pursuant to 11 U.S.C. § 363(f)(2). *See In re Eliot*, 94

4    B.R. 343, 345 (E.D.Pa. 1988) (consent of an entity asserting an interest in the property

5    sought to be sold can be implied if such entity fails to make a timely objection to the sale

6    after receiving notice of the sale).

7         **2.    Nevada Restaurant Services, Inc.'s Interest is in Bona Fide Dispute.**

8    A debtor may sell assets free and clear of liens, claims, interests and encumbrances

9    if "such interest is in bona fide dispute." 11 U.S.C. § 363(f)(4). Although the term "bona

10   fide dispute" is not defined, courts have found an interest to be subject to a bona fide

11   dispute if "there is an objective basis for either a factual or legal dispute as to the validity"

12   of the interest. *In re Gulf States Steel, Inc.*, 285 B.R. 497, 507 (Bankr.N.D.Ala. 2002).

13   The court need not resolve the dispute prior to the sale; it need only determine that such a

14   dispute exists. *In re Gaylord Grain LLC*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004). In

15   fact, the propriety of the alleged interest does not even have to be the subject of an

16   immediate or concurrent adversary proceeding. *Id.*

17   It must be pointed out that the only other person or entity that has filed a UCC-1

18   Financing Statement other than those listed in Exhibit "C", is Nevada Restaurant Services,

19   Inc. Nevada Restaurant Services, Inc. is an equipment lessor and not a secured party. It

20   filed the UCC-1 on July 12, 2010 as filing number 20100171460, nine (9) days prior to

21   the Petition Date. Therefore, Nevada Restaurant Services, Inc.'s UCC-1 Financing

22   Statement is avoidable as a preferential transfer under 11 U.S.C. § 547 and in bona fide

23   dispute.

24   Other than the liens of the Equipment Lenders and RE Reno (and Nevada

25   Restaurant Services, Inc.), the Debtors are not aware of the existence of any other

26   encumbrances against the Property. If any other claims, liens or encumbrances against the

27   Property exist, the sale order will provide that all such liens shall attach to the proceeds of

28   the sale in the same validity and priority and subject to the same defenses and

- 22 -

avoidability, if any, as before the sale, thereby satisfying the provisions of 11 U.S.C.
§ 363.  Accordingly, the Debtor offers that the auction sale of the Property should be free
and clear of all claims, liens and encumbrances, with any such holders' interests attaching
to the proceeds of the sale.

In addition to the foregoing, the Debtors further offer that they have satisfied 11
U.S.C. § 363(f)(5) as discussed below.

**3.    The Party Asserting the Interest Could be Compelled to Accept a**
**Money Satisfaction.**

The Bankruptcy Code also provides that assets may be sold free and clear of liens,
claims, interests and encumbrances if the holders thereof "could be compelled, in a legal
or equitable proceeding, to accept a money satisfaction of [their] interest[s]." 11 U.S.C.
§ 363(f)(5).  Pursuant to § 363(f)(5), a trustee may sell property free and clear of any
interest if the holder of that interest "could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of [their] interest[s]." 11 U.S.C. § 363(f)(5);
*see, e.g., P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dept. of*
*Medical Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.)*, 189 B.R. 90
(Bankr.E.D.Va. 1995) (allowing sale of nursing home assets under § 363(f)(5) over
objection of lienholder where its interest was reducible to a claim and subject to a
hypothetical money satisfaction); *see also In re Oglesby*, 196 B.R. 938, 944
(Bankr.E.D.Va. 1996) (courts give § 363(f)(5) a broad reading by holding that a "cram
down" as permitted in a chapter 11 case and a subordination of a tax lien under 11 U.S.C.
§ 724(b) in a chapter 7 case are "legal and equitable proceedings" which may be invoked
under § 363(f)(5) to authorize sale free and clear).

The Ninth Circuit Bankruptcy Appellate Panel recently scrutinized section
363(f)(5) in the context of the sale of real property. *See Clear Channel Outdoor, Inc. v.*
*Knupfer (In re PW, LLC)*, 391 B.R. 25 (B.A.P. 9th Cir. 2008).  In *Clear Channel*, the
senior secured creditor attempted to purchase the debtor's real property by way of a credit
bid, free and clear of the interest of a nonconsenting junior lienholder outside of a plan of

- 23 -

1    reorganization.  The bankruptcy court approved the sale to the senior lender under 11

2    U.S.C. § 363(f)(5) finding that it permits a sale free and clear of the creditor's interest in

3    property "whenever a claim can be paid with money."  *Id.* at 42.

4          In reversing the bankruptcy court's decision, the Bankruptcy Appellate Panel found

5    that 11 U.S.C. § 363(f)(5) requires that "(1) a proceeding exists or could be brought, in

6    which (2) the nondebtor could be compelled to accept a money satisfaction of (3) its

7    interest."  *Id.* at 41.  Taking up these factors in reverse order, the Bankruptcy Appellate

8    Panel concluded that a lien, such as the liens of RE Reno and the Equipment Lenders at

9    issue here, constitute an "interest" for purposes of 11 U.S.C. § 363(f)(5).  With respect to

10   the second factor, 11 U.S.C. § 363(f)(5) refers to those proceedings in which the creditor

11   "could be compelled to take *less* than the value of the claim secured by the interest."  *Id.*

12   In order to approve a sale free and clear, the court must "make a finding of the existence

13   of . . . a mechanism [to address extinguishing the lien or interest without paying such

14   interest in full] and the [debtor in possession] must demonstrate how satisfaction of the

15   lien 'could be compelled.'"  *Id.* at 45.  Finally, the Bankruptcy Appellate Panel held that

16   11 U.S.C. § 363(f)(5) requires that there be, "the possibility of, some proceeding, either at

17   law or at equity, in which the nondebtor could be forced to accept money in satisfaction of

18   its interest."  *Id.*

19         Though there is no minimum bid, the Debtors expect the opening bid for the

20   Property to be over $3,000,000, more than the aggregate value of liens on the Property.

21   Moreover, the Purchase Agreement attached hereto as Exhibit "A" provides that the

22   Debtors will deliver the Property to the Successful Buyer free and clear of all liens, claims

23   and encumbrances and for all liens of the Equipment Lenders to attach to the net sale

24   proceeds to be received by the Debtors in the same validity and priority and subject to the

25   same defenses and avoidability, if any, as before the sale.  The Debtors submit that the

26   forgoing treatment of the liens of the Equipment Lenders satisfies 11 U.S.C. § 363(f)(3)

27   and (5).

28

All of the above requirements for cram down are satisfied here. The sale of the Property will be subject to a public auction and as discussed above, will be conducted in good faith. While the Debtors do not believe that there are any secured creditors with valid liens against the Property other than RE Reno, if there are any others, they are being treated fairly and in accordance with their respective lien priorities, so there is no unfair discrimination present in the proposed auction sale here. Finally, any such secured creditor will receive the actual value of its secured claim as measured by 11 U.S.C. § 506(a).

Based upon the foregoing, all creditors of the Debtor, including all purported secured creditors, could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interest. The Debtors' proposed auction sale of the Property to the Successful Buyer should therefore be free and clear of all liens, claims and encumbrances.

## V.

## THE COURT SHOULD PERMIT IMMEDIATE RELIEF

The Debtors request that the Court waive Bankruptcy Rule 6004(h) ("Rule 6004(h)"), which provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." (emphasis supplied). Although Rule 6004(h) is silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to permit a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L, King, 15th rev. ed. 1988).

Here, a waiver of Rule 6004(h) will permit the Debtors to immediately realize the value of the Property and its personal property assets for the benefit of the estates and their creditors and should, therefore, be granted.

- 25 -

LA/353268.1

# VI.

## THE DEBTORS SHOULD BE AUTHORIZED TO ASSUME AND

## ASSIGN ALL EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## THE SUCCESSFUL BUYER WISHES TO HAVE ASSIGNED

Included in the assets to be sold to the Successful Buyer are the unexpired leases and executory contracts attached hereto as Exhibit "B", which the Successful Buyer may designate for assumption and assignment. The Debtors request, pursuant to 11 U.S.C. § 365, authority to assume and assign the Debtors' interests in the unexpired leases and executory contracts in the event that the Successful Buyer wishes to have such agreements assigned to it concurrently with the closing of the sale contemplated herein. The Successful Buyer will have to pay all cure costs in addition to the ultimate auction purchase price.

Section 365 of the Bankruptcy Code provides in relevant part that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
> (A)    The trustee assumes such contract or lease in accordance with the provisions of this section; and
> (B)    Adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease of a debtor, providing in pertinent part that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
> (A)  cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;
> (B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C)  provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). In determining whether to approve a debtor-in-possession's decision to assume an unexpired lease or executory contract, courts have consistently

- 26 -

applied a business judgment test. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523, 550 (1953). A debtor satisfies the business judgment test when it determines, in good faith, that assumption of the lease or executory contract will benefit the estate. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr.E.D.N.Y. 1986).

Exhibit "B" attached hereto lists all of the Debtors' unexpired leases and executory contracts that the Successful Buyer may elect to have the Debtors assume and assign at the closing of the sale. The Successful Buyer shall have until the entry of the order approving the sale to designate which of such Unexpired Contracts and Leases it chooses to purchase and have the Debtors assume and assign to the Successful Buyer. Exhibit "B" also provides the amounts the Debtors believe are necessary to cure any defaults under each of the Unexpired Contracts and Leases based on the Debtors' books and records. All other Unexpired Contracts and Leases not assumed and assigned to the Successful Buyer shall be deemed rejected as of the Petition Date.

The Debtors are also requesting an order of the Court that the cure amounts set forth in Exhibit "B" hereto are the cure amounts which the Successful Buyer must pay (in addition to the ultimate sale price) to the other parties to the Assumed Agreements to enable the Debtors to satisfy the cure requirements of 11 U.S.C. § 365(b)(1)(A). The Debtors therefore submit that any party that fails to file a timely objection to this Motion should be deemed to have consented to the Debtors' proposed cure amount and be forever barred from challenging the Debtors' proposed cure amount. In connection with the Debtors' assumption and assignment of any unexpired leases or executory contracts to the Successful Buyer, the Successful Buyer shall be deemed to have assumed any ongoing liabilities and obligations in connection with the Assumed Agreements. Successful Buyer shall provide the party to the Assumed Agreements who request in writing such financial information as is reasonably required to enable Successful Buyer to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to the Assumed Agreements.

LA/353268.1

# VII.

## CONCLUSION

**WHEREFORE**, based on the foregoing, the Debtors respectfully request that the Court enter an order: (a) establishing auction procedures with respect to the sale of the Debtors' real and personal property; (b) approving and authorizing the sale by auction of the Debtors' real property free and clear of liens, claims, interests, and encumbrances, subject to higher and better offers, (c) approving the assumption and assignment of certain unexpired leases and executory contracts to the winning bidder and establishing the cure amounts, if any, payable under such Assumed Agreements, or, in the alternative, approving the rejection of the Debtors' unexpired leases and executory contracts to the extent such agreements are not assumed and assigned to the winning bidder, (d) approving that certain addendum to Innovation's engagement letter dated October 28, 2010; (e) waiving the 14 day stay provided in Rule 6004(h); and (f) granting such other and further relief the Court deems just and proper.

Dated:  November 1, 2010                        Respectfully submitted,

                                                **ARENT FOX LLP**


                                                By: _/s/ Aram Ordubegian_
                                                      ARAM ORDUBEGIAN
                                                      METTE H. KURTH
                                                      ANDY S. KONG
                                                      Attorneys for Debtors and Debtors-in-
                                                      Possession

- 28 -

LA/353268.1

## DECLARATION OF MATTHEW J. SODL

I, Matthew J. Sodl, declare that:

1.       I am an individual over the age of twenty-one (21) and a Managing Director of Innovation Capital, LLC ("Innovation"), an investment banking and financial advisory firm with its principal office located at 222 N. Sepulveda Blvd., Ste. 2175, El Segundo, California 90245. I am authorized to execute this declaration (the "Declaration") on behalf of Innovation. Innovation's restructuring and reorganization advisory practice focuses on advising companies and creditors in the gaming, leisure and hospitality industries in connection with financial restructurings and bankruptcies. Innovation's professionals have extensive experience working with financially troubled companies in complex financial restructurings and Section 363 asset sale transactions.

2.       I make this declaration in support of the Debtors and Debtors-in-Possession's *Emergency Motion for an Order: (1) Establishing Auction Procedures with Respect to the Sale of the Debtors' Real and Personal Property; (2) Approving and Authorizing the Sale by Auction of the Debtors' Real and Personal Property Free and Clear of Liens, Claims, and Encumbrances, Subject to Higher and Better Offers; (3) Approving Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and Determining Cure Amounts, or, in the Alternative, Approving the Rejection of Unexpired Leases and Executory Contracts; (4) Approving the Form and Manner of Notice; and (5) Approving the Addendum to Innovation Capital LLC's Engagement Letter Dated October 28, 2010* (the "Motion"). Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.

3.       After the filing of these bankruptcy cases, Wild Game entered into an engagement letter on September 20, 2010 with Innovation and filed an application to employ Innovation as their investment banker to assist them in locating a transaction partner to provide new money financing or -- subject to the execution by the Debtors' of a written addendum to Innovation's engagement letter -- to assist them in locating a buyer to purchase the Debtors' assets and more specifically, the Property and Wild Game's

- 29 -

LA/353268.1

personal property. The Debtors and Innovation have been actively engaged in seeking a new money financing partner since that time, and more recently, they have been actively engaged in seeking a purchaser and structuring a sale process since roughly October 1, 2010. Most new financing partners also expressed an interest in buying the Property and the personal property assets outright at an auction.

4.      On or about October 28, 2010, the Debtors' executed an addendum to Innovation's engagement letter formally expanding Innovation's engagement to include assistance in locating an investor to purchase the Debtors' assets and to retroactively approve and ratify Innovation's prior efforts in that respect. Attached hereto as Exhibit "D" is a true and correct copy of the addendum.

5.      On October 8, 2010, the Debtors were faced with a serious liquidity crisis precipitated by their inability to pay certain required post-petition obligations. The Debtors considered a full shutdown of the Siena at that time. However, several investors remained interested in financing the property's operations or purchasing the Property, even on a very compressed timeframe. Accordingly, in order to allow the negotiations to further develop, the Debtors took the interim step of closing the gaming floor at the Siena, thereby eliminating their minimum bankroll requirement and freeing up cash to pay various operating expenses, including outstanding utility bills, Nevada gaming taxes, and certain insurance premiums.

6.      This then drastic step provided the Debtors and Innovation with additional time to continue dialog with various interested investors. While the Debtors and Innovation have made significant progress in developing sale and auction procedures and there is considerable investor interest among parties with the financial means to purchase the Property, the loss of revenue precipitated by the closing of the gaming floor left Wild Game without sufficient revenue to continue to operate the hotel business. Accordingly, on October 21, 2010, the Debtors concluded that they are unable to continue to fund operations while these negotiations played out, and shutdown their hotel operation.

7.      Since the shutdown of the hotel operation, Innovation and the Debtors have

- 30 -

LA/353268.1

1  continued to engage in substantial due diligence and negotiations with a number of

2  different prospective buyers.  However, none of the prospective buyers have made a

3  binding, acceptable offer at this time, nor has any party been approved by the Debtors to

4  serve as a "stalking-horse" buyer.  Innovation has been informed from numerous

5  prospective purchasers however, that they intend to participate at an auction and that they

6  can be prepared to make a binding purchase offer as early as November 9, 2010.

7  Innovation and the Debtors have identified at least three to four serious investors with the

8  desire and financial means to acquire the Property and personal property assets.  They

9  have been approached by additional interested buyers over the weekend, and they are still

10  in discussions with at least one party interested in financing a re-start of Wild Game's

11  operations.

12        8.     Given the fact that Innovation has already canvassed the most likely

13  purchasers for the Property; many of those potential purchasers have conducted

14  considerable due diligence; the Property sale, which is little more than a real estate

15  transaction at this juncture, is not particularly complex; and many of the potential

16  purchasers have indicated that they will be prepared to bid at an auction by November 9,

17  2010 -- the proposed auction strategy provided in the Motion and date is the appropriate

18  value-maximizing strategy for the Property under the circumstances.

19        9.     Given the level of due diligence activity and the number of parties who

20  continue to work to confirm their interest in the Siena assets, I expect there will be

21  multiple rounds of bidding at the Auction.

22       10.    I believe it is critical to consummate a sale of the Property on an expedited

23  basis due to the shutdown of the Siena and the continuing deterioration of Siena's

24  goodwill if a sale is not consummated on an emergency basis.  In addition, I am informed

25  and believe and allege that given the shutdown of the Siena, the Property is now incurring

26  monthly maintenance costs without generating operating income to cover those costs, and

27  the Property is exposed to the risk of vandalism and other deterioration

28

LA/353268.1

associated with maintaining the Property in a non-operational, boarded up condition. I therefore believe that an expedited sale of the Property is necessary to minimize immediate and irreparable harm to the Debtors' Property, creditors and the bankruptcy estates. Having not yet received a binding, acceptable offer, under the circumstances, I believe that an expedited public auction sale will bring the maximum value for the Property and will be in the best interest of the Debtors' estates and creditors. At the Auction, Qualified Bidders will have an opportunity to overbid on the Property.

11.    Innovation will continue to actively market the Property to its broad network of contacts within the gaming, leisure and hospitality industries. Innovation will continue to speak with potential parties interested in purchasing the Property through the date (November 8, 2010) on which interested parties will be deemed qualified to participate in the November 9, 2010 auction.

12.    Since the Property and the personal property assets will be sold after extensive marketing and in auction format, I believe that the final purchase price offered for the Debtors' assets at the conclusion of the Auction will establish the fair market value for the Property and the personal property assets.

13.    All known interested buyers will be contacted by telephone and email by Innovation within twenty-four (24) hours of entry of the Court's order approving the Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of November 2010, at El Segundo, California.

MATTHEW J. SODL

- 32 -

LA/353268.1

## DECLARATION OF ARAM ORDUBEGIAN

I, Aram Ordubegian, declare that:

1.     I am a partner of the firm Arent Fox LLP ("Arent Fox"), general bankruptcy and restructuring counsel for the above-captioned debtors and debtors-in-possession.

2.     I make this declaration in support of the Debtors and Debtors-in-Possession's *Emergency Motion for an Order: (1) Establishing Auction Procedures with Respect to the Sale of the Debtors' Real and Personal Property; (2) Approving and Authorizing the Sale by Auction of the Debtors' Real and Personal Property Free and Clear of Liens, Claims, and Encumbrances, Subject to Higher and Better Offers; (3) Approving Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and Determining Cure Amounts, or, in the Alternative, Approving the Rejection of Unexpired Leases and Executory Contracts; (4) Approving the Form and Manner of Notice; and (5) Approving the Addendum to Innovation Capital LLC's Engagement Letter Dated October 28, 2010* (the "Motion").  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.

3.     The factual allegations in support of the Motion are set forth in Section II of the Motion.

4.     Debtors have determined that the appropriate strategy to maximize value to their creditors is to conduct a sale by public auction of the Property as provided herein. Naturally, the Debtors are open to a longer marketing and auction period if such is stipulated to by the parties or ordered by the Court.  The short time period is necessitated by the fact that the Debtors believe that on or about November 1, 2010, certain utility companies and their insurance carrier will issue ten (10) day termination notices to the Debtors for post-petition expenses that the Debtors have no cash resources to satisfy absent a sale of the Property and personal property assets.  If utilities are terminated, the Property is at risk of being "red-tagged" by the fire department because without utilities, essential fire-safety equipment cannot be maintained, further reducing the value of the Property.

LA/353268.1

5. I have been in extensive discussions with the Committee and RE Reno. I submit that, under the circumstances, the Committee and RE Reno will both consent to the auction sale of the Property and Wild Game's personal property assets.

6. Attached hereto as Exhibit "C" is a list of all purported lienholders with an interest in the Property to be sold.

7. The Debtors will require any Qualified Bidder to execute a *Real Property Purchase and Sale Agreement* substantially in the form attached hereto as Exhibit "A".

8. As the Court is aware, the Debtors have suffered serious, ongoing liquidity issues which resulted in the closing of Siena's gaming floor recently and ultimately, the shutdown of their business operations on October 21, 2010.

9. The Debtors and Innovation have been actively engaged in seeking a new money financing partner, and more recently, they have been actively engaged in seeking a purchaser and structuring a sale process since roughly October 1, 2010. On or about October 28, 2010, the Debtors' executed an addendum to Innovation's engagement letter, a true and correct copy of which is attached hereto as Exhibit "D", formally expanding Innovation's engagement to include assistance in locating an investor to purchase the Debtors' assets and to retroactively approve and ratify Innovation's prior efforts in that respect. Innovation, working closely with the Debtors' insiders, has conducted an exhaustive sale process, has prepared detailed sale materials, and has had extensive discussions and interactions with numerous prospective buyers. While Innovation has engaged in substantial due diligence and negotiations with a number of different prospective buyers, none of the prospective buyers have made a binding, acceptable offer at this time. I am informed and believe and on that basis allege that numerous prospective purchasers have informed Innovation that they intend to participate at an auction and that they can be prepared to make a binding purchase offer as early as November 9, 2010.

10. The Debtors believe that it is critical to consummate a sale of the Property on an expedited basis due to the shutdown of the Siena and the continuing deterioration of Siena's goodwill if a sale is not consummated on an emergency basis. In addition, given

- 34 -

LA/353268.1

the shutdown of the Siena, the Property is now incurring monthly maintenance costs without generating operating income to cover those costs, and the Property is exposed to the risk of vandalism and other deterioration associated with maintaining the Property in a non-operational, boarded up condition. The Debtors therefore believe that an expedited sale of the Property is necessary to minimize immediate and irreparable harm to the Debtors' Property, creditors and the bankruptcy estates. Having not yet received a binding, acceptable offer, under the circumstances, the Debtors believe that a public auction sale will bring the maximum value for the Property and will be in the best interest of the Debtors' estates and creditors. At the Auction, Qualified Bidders will have an opportunity to overbid on the Property.

11. Notice of this Auction will be distributed in a manner to encourage participation in the Auction by as many interested qualified buyers as possible and notice of the Auction will be provided in accordance with the FRBP and Local Bankruptcy Rules.

12. As evidenced by the closing of the gaming floor and the recent shutdown of the Debtors' business operations, I do not believe the Debtors have the ability to survive in these chapter 11 cases for much longer. If the Debtors are unable to sell the Property by auction in these chapter 11 cases on an expedited timeframe, these cases will be converted to cases under chapter 7, incurring an additional layer of administrative expenses and wasting invaluable time while the Debtors' customer base and goodwill continue to deteriorate, to the detriment of the Debtors' estates and the creditor body.

13. Arent Fox LLP has conducted a UCC-1 search and the results thereof show five entities having filed UCC-1 financing statements with respect to various gaming equipment and lighting fixtures owned by Wild Game and located at the Siena. A list of the parties having filed UCC-1 financing statements is attached hereto as Exhibit "C". The Debtors have not yet determined whether the underlying agreements with these parties are properly characterized as leases or financing agreements. Other than the liens

- 35 -

LA/353268.1

1  of the Equipment Lenders and RE Reno (and Nevada Restaurant Services, Inc.), the

2  Debtors are not aware of the existence of any other encumbrances against the Property.

3       14.    The Debtors will provide notice of the Motion and Auction to the

4  foregoing Equipment Lenders and Nevada Restaurant Services, Inc.  All known interested

5  buyers will be sent a copy of the order approving the auction procedures and notice of the

6  Auction by email and overnight mail and will be contacted by telephone and email by

7  Innovation within twenty-four (24) hours of entry of the Court's order.

8       15.    Included in the assets to be sold to the Successful Buyer are the unexpired

9  leases and executory contracts attached hereto as Exhibit "B", which the Successful Buyer

10 may designate for assumption and assignment.

11      I declare under penalty of perjury under the laws of the United States of America

12 that the foregoing is true and correct.

13      Executed this 1st day of November 2010, at Los Angeles, California.

14

15                                 ARAM ORDUBEGIAN

16

17

18

19

20

21

22

23

24

25

26

27

28

LA/353268.1